IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROTHCHILD FAMILY PARTNERSHIP #2 LTD, ROTHCHILD MOORE INVESTMENTS LTD, ROTHCHILD MOORE INVESTMENTS II LLC, ROTHCHILD MOORE INVESTMENTS III LLC | § § § § § § | |
| *Plaintiffs* | § § | CIVIL ACTION NO. 4:18-cv-2594 |
| v. | § § | |
| STATE AUTOMOBILE MUTUAL INSURANCE COMPANY | § § | |
| *Defendant* | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE AUTO'S MOTION FOR SUMMARY JUDGMENT AND OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Plaintiffs Rothchild Family Partnership #2 LTD, Rothchild Moore Investments LTD, Rothchild Moore Investments II LLC, Rothchild Moore Investments III LLC ("Plaintiffs") respond in opposition to State Auto's motion for summary judgment, and objects to State Auto's summary judgment evidence pursuant to Fed. R. Civ. P. 56(c)(2).

### I.   SUMMARY JUDGMENT EVIDENCE

| |
|---|
| 1.   Declaration of Joseph B. Rothchild |
| 2.   Declaration of Thomas Irmiter |
| 3.   Declaration of Rebecca Calvert |
| 4.   Excerpts of deposition of Jennifer Stivers |
| 5.   Excerpts of deposition of Daniel Prough |
| 6.   October 5, 2017 partial declination letter to Rothchild Family |
| 7.   October 13, 2017 partial declination letter to Rothchild Moore |
| 8.   Excerpts of deposition of Julie Corbett |

| |
|---|
| 9. Excerpts of deposition of Rebecca Calvert |
| 10. Excerpts of deposition of Tom Irmiter |
| 11. Declaration of Stephen Strzelec |
| 12. State Auto's letter to Rothchild Family responding to demand |
| 13. State Auto's letter to Rothchild Moore responding to demand |
| 14. [Filed under seal] |

## II.   FACTS

### The Properties and Policies

1.      This case involves ten commercial properties in the Katy and West Houston area. At the time Hurricane Harvey struck the Houston/Katy area and at the time of filing the insurance claims and this lawsuit, Rothchild Family Partnership #2, LTD ("Rothchild Family") owned and operated the commercial properties located at the following locations:

- 15115 Westheimer Road, Houston, Texas 77082;

- 14800 Westheimer Road, Houston, Texas 77077;

- 15015 Westheimer Road Houston, Texas 77082;

- 3719 Fry Road, Katy, Texas 77450;

- 920 South Fry Road, Katy, Texas 77450;

- 5613 2nd Street, Katy, Texas 77450; and

- 5613 3rd Street, Katy, Texas 77450, in Harris County, Texas.

These seven properties are referred to as the "Rothchild Family Properties." (*See* Ex. 1, Declaration of Joseph Rothchild ("Rothchild Decl.") ¶ 3.)

2.      At the time Hurricane Harvey struck the Houston/Katy area and at the time of filing the insurance claims and this lawsuit, Rothchild Moore owned and operated the commercial property located at **8945 South Fry Road**, Katy, Texas 77494 in Fort Bend County, Texas, Rothchild Moore

II owned and operated the commercial property located at **1997 Katy Mills Blvd**, Katy, Texas 77494 in Harris County, Texas, and Rothchild Moore III owned and operated the commercial property located at **9006 South Fry Road**, Katy, Texas 77494 in Fort Bend County, Texas. These three properties are referred to as the "Rothchild Moore Properties."

3.     Beginning in 2011, State Auto insured the Rothchild Family Properties under Policy No. Policy No. BOP 2816131 03 (the "Rothchild Family Policy"), and insured the Rothchild Moore Properties under BOP 2816136 03 (the "Rothchild Moore Policy") (collectively, the two policies referred to as the "Policies"). (*See* Dkt. 19-1, Rothchild Family Policy; Dkt. 19-2, Rothchild Moore Policy.) The Policies were in effect during Hurricane Harvey in August 25-29, 2017. (*See id.*)

4.     Each Policy is an "all risks" Policy, which means that there is coverage for "direct physical loss of or damage to Covered Property. . . resulting from any Covered Cause of Loss . . . unless the loss is excluded or limited" by the Policy. (*See* Dkt. 19-1, Rothchild Family Policy, at 88; Dkt. 19-2, Rothchild Moore Policy, at 245).

### Hurricane Harvey and Plaintiffs' filing of their insurance claim

5.     On August 25, 2017, Hurricane Harvey, one of the most devastating natural disasters in American history, made landfall in Texas. After Harvey struck the area, every one of the ten Properties suffered damage, including significant interior leaks. (*See* Rothchild Decl. ¶ 7); Ex. 2, Declaration of Tom Irmiter ("Irmiter Decl.") ¶¶ 13-24; Ex. 3, Declaration of Rebecca Calvert ("Calvert Decl.") ¶¶ 9-20.)

6.     On or about August 31, 2017, Plaintiffs promptly filed an insurance claim with State Auto. (Rothchild Decl. ¶ 7). This was the first time Plaintiffs had filed a weather-related

insurance claim under the Policies with State Auto, for any of the ten Properties. (*Id.* ¶ 8).[1] Plaintiffs did not file a claim after the significant storms that hit the Houston area in 2015 (the "Memorial Day" storm) or in 2016 (the "Tax Day" storm). (*Id.* ¶ 9). Any other repairs made from the inception of the Policies in 2011 through August 2017, when Harvey struck, were routine maintenance and repairs. (*Id.* ¶ 10).

7.    It was only until after Hurricane Harvey hit in August 2017 that the Properties began experiencing significant interior leaking. (*See id.* ¶ 11). Those leaks were not present in the weeks and months before Harvey. (*See id.*)

### *After more than three weeks of delays, State Auto's third adjuster finds covered damage to the interior of the Properties.*

8.    After receiving and documenting Plaintiffs' claim, State Auto's desk adjuster Jennifer Stivers assigned a field adjuster named Jesus Gonzalez to adjust Plaintiffs' claims. (*See* Ex. 4, excerpts of deposition of Jennifer Stivers ("Stivers Dep."), at 33:23-34:9.) It was not until September 14 – nearly two weeks after receiving Plaintiffs' claim – that Stivers realized that Gonzalez was no longer assigned to the claims, and that only one of the ten Properties had been inspected. (*Id.* at 37:11-38:5; 42:20-43:1).

9.    Stivers then assigned an adjuster named David Dykstra to the claim, but Dykstra never inspected any of the Properties. (*Id.* at 43:2-13). The third adjuster, Daniel Prough, ended up inspecting all ten Properties between September 25 and 27. (*Id.* at 43:2-7; Ex. 5, deposition of Daniel Prough ("Prough Dep."), 35:17-21).

10.    Based on Prough's inspections, State Auto found covered damage to the interiors

---

[1] Plaintiffs had previously filed claims in September 2013 involving a car crash into an exterior sign at 15015 Westheimer, in February 2015 involving failure of a hot water heater at 3719 N. Fry Road, and involving damage by a vehicle to an exterior wall at 14800 Westheimer. (Rothchild Decl. ¶ 8).

of all ten properties, and communicated this to the Plaintiffs through two separate letters. (Stivers Dep. at 76:11-15; Ex. 6, October 5, 2017 letter; Ex. 7, October 13, 2017 letter; Ex. 8, deposition of Julie Corbett ("Corbett Dep.") at 65:8-23, 67:22-68:2, 77:15-78:17).) For only one of the properties, 3719 Fry Road, did State Auto find damages that exceeded the applicable $5,000 deductible. (Ex. 6; Corbett Dep. 64:11-19; 65:19-23).

11.    State Auto nonetheless declined coverage for damage to the roof and exterior of all ten buildings, invoking policy exclusions and limitations including "faulty design, faulty workmanship," and "wear and tear," and finding "no storm created openings." (*See* Ex. 6, 7).

12.    To reach those conclusions, State Auto relied almost exclusively on the "visual inspections" and the "eye test" of its adjuster, Daniel Prough. (*See* Corbett Dep. 69:10-18; 71:14-72:2; 72:22-73:8; 75:8-18). State Auto did not study or consult meteorology reports or wind speeds in the area at the time of loss for Hurricane Harvey because Prough felt it was "irrelevant . . .because there was no wind damages present" (Corbett Dep. 62:6-9, 59:24-60:2; Prough Dep. 57:16-58:4). It did no research of the ages of any of the roofs, despite finding "deterioration" and "wear and tear." (Prough Dep. 54:19-55:16). It did no research on the Properties' maintenance history, repair logs, or other building records, despite citing "faulty workmanship," "prior repairs," and "faulty design." (Corbett Dep. 72:22-73:8; Prough Dep. 52:7-53:8).

13.    State Auto never hired an engineer, building consultant, or any other expert before denying Plaintiffs' claims, waiting until this lawsuit to do so. (Prough Dep. 72:23-73:6; Corbett Dep. 59:17-60:10).

### *State Auto's underwriting of the Policies directly conflicts with its claim denial.*

14.    [Filed under seal][2].

---

[2] Pursuant to the Court's Agreed Interim Protective Order (Dkt. 13), State Auto filed certain deposition testimony as "Confidential Information." Pursuant to section 8 of the Court's Order,

### III.   OVERVIEW/SUMMARY OF THE ARGUMENT

On the deadline to file motions, State Auto filed three motions that, if granted, would wipe out Plaintiffs' entire case and absolve State Auto of any liability for its violations of the Texas Insurance Code, common law, and the applicable Policies. On September 9, Plaintiffs filed responses to State Auto's motion to exclude or limit testimony of experts Tom Irmiter and Rebecca Calvert (Dkt. 23), and to its motion to exclude or limit testimony of Stephen Strzelec (Dkt. 24). Plaintiffs respond here to State Auto's sweeping motion for summary judgment. (Dkt. 19).

The wealth of summary judgment evidence supports Plaintiffs' claims and, at bare minimum, creates genuine issues of material fact for which summary judgment is inappropriate. As a threshold matter, State Auto seeks dismissal of Plaintiffs' entire case even though it **found covered damages to the interiors of all ten Properties that was caused by Hurricane Harvey.** This is no minor concession; State Auto acknowledges every one of the Properties suffered damage during the applicable policy periods. But despite its own findings of coverage, State Auto denied the remainder of Plaintiffs' claims for damage to the roof and exterior because the "visual inspections" of its adjuster – the third adjuster it had hired to inspect the Properties – did not show covered damage. State Auto did so without conducting *any* research of weather data or wind speeds in the area, and without doing any research on the historical conditions of the Properties that formed the basis for its "wear and tear" and "deterioration" denials. State Auto performed a haphazard, results oriented claims adjustment that was based not on investigation and data, but on conjecture and speculation. This failed to meet the minimum standards required by Texas law, and the jury should decide whether State Auto's conduct violated the law.

---

Plaintiffs file the portion of their response that includes the Confidential Information separately under seal, and incorporates same by reference herein.

The detailed, exhaustive investigation of Plaintiffs' experts showed significant damage to the roofs of each Property that was caused by Hurricane Harvey and is therefore covered under the Policies. Not only will Plaintiffs' experts opine on the cause of the damage to the Properties, but they are prepared to testify that other potential, non-Harvey factors were *not* the cause of the damage. This, plus the evidence from Plaintiffs regarding the repair and insurance claims histories of the Properties, suffice to defeat State Auto's argument that Plaintiffs cannot "allocate" or "segregate" covered from non-covered damages. This same evidence supports denial of State Auto's summary judgment as to Plaintiffs' extracontractual claims, both under the common law and Texas statutes. Moreover, State Auto's hypertechnical arguments regarding application of the actual cash value limitation under the Policies, and attorneys' fees under Section 542A, likewise fail.

Lastly, Plaintiffs object to a significant portion of State Auto's submitted summary judgment evidence. State Auto relies heavily on unauthenticated documents, hearsay evidence, and speculative opinion evidence that would not be admissible at trial. The Court should disregard that evidence.

## IV. ARGUMENT AND AUTHORITIES

### A. The summary judgment standard is well-settled.

A motion for summary judgment requires the movant to prove, as a matter of law, that the nonmoving party raised "no genuine issue as to any material fact" as to each claim subject to the motion. FED. R. CIV. P. 56(a). Before determining that a movant satisfied this burden, this Court must resolve all doubts and indulge all reasonable inferences in favor of the nonmoving party. *McPherson v. Rankin*, 736 F.2d 175, 180 (5th Cir. 1984). As long as there appears to be "some support" for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

**B.  The law governing burdens and allocation of damages applicable here are well-settled in Texas and within the Fifth Circuit.**

State Auto's first argument is that Plaintiffs "cannot meet their burden to segregate non-covered preexisting damage, nor prove the damage claimed occurred within the policy period." (Dkt. 19 at 11). Specifically, it invokes the doctrine of "concurrent causation" for the argument that "Plaintiffs cannot segregate preexisting and non-covered building damage" from that covered under the Policies. (*Id.* at 12). This is an attack on Plaintiffs' breach of contract claim. (*See* Dkt. 19 ¶ 18) ("Plaintiff's claim for breach of contract . . .  fails.") As a threshold matter, an overview of the applicable burdens on the parties—both under Texas substantive law, and federal summary judgment law—is important to the Court's resolution of State Auto's motion in Plaintiffs' favor.

**(1)  The Policies are "all-risk" policies.**

First, it is important to the understanding of the parties' respective summary judgment burdens to note that the Policies at issue in this case are "all-risk" policies. Under an all-risk policy, physical loss or damage to the insured property is covered unless specifically excluded. *See JAW The Pointe, L.L.C. v. Lexington Ins. Co.,* 460 S.W.3d 597, 604 (Tex. 2015) (explaining an all-risk policy "covers any 'physical loss or damage to Covered Property at the premises,' no matter what causes that loss or damage, unless the policy specifically excludes or limits coverage for losses resulting from a specific cause") (*citing SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's, London,* 179 S.W.3d 619, 627 n.3 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Here, as State Auto acknowledges, both Policies provide, "[w]e will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (Dkt. 19-1, Rothchild Family Policy, at 89, § A.3; Dkt. 19-2, Rothchild Moore Policy, at 78, § A.3). The Policies then define "Covered Cause of Loss" to include "[r]isks of direct physical loss unless the loss is "excluded in Section B, Exclusions or limited in Paragraph A.4, Limitations,

that follow." (Dkt. 19-1, Rothchild Family Policy, at 90, § A.3; Dkt. 19-2, Rothchild Moore Policy, at 79, § A.3). The Policies are therefore all-risk policies because they encompass "all risks of direct physical loss" unless excluded or limited. *See id.; JAW The Pointe, L.L.C.* 460 S.W.3d at 604.

> **(2) Under Texas substantive law, Plaintiffs bear the initial burden to show covered damages under the applicable policy.**

Plaintiffs agree with State Auto that Texas substantive law applies in this diversity action. (*See* Dkt. 19 ¶ 13). Under Texas substantive law, in the context of a first-party insurance dispute over whether an insurer breached the insurance contract, the court must look to the terms of the insurance policy to evaluate whether the underlying claim was covered. *See, e.g., United Neurology, P.A. v. Hartford Lloyd's Ins. Co.*, 101 F. Supp. 3d 584, 593 (S.D. Tex. 2015) (construing Texas law) (internal citations omitted). And as noted above, under an all-risk policy, physical loss or damage to the insured property is covered unless specifically excluded or limited. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.,* 460 S.W.3d at 604. Texas law provides clear instructions regarding parties' relative burdens for proving coverage and damages under all-risk policies like the Policies here. In a recent opinion, the Fifth Circuit fully laid out the appropriate burdens as follows:

> Under Texas law, an insured suing for breach of an insurance agreement bears the initial burden of proving that his loss results from a covered risk. But if the insurance policy contains exclusions to coverage, it is the insurer's burden to prove the exclusion applies**.**
>
> Similar rules govern an insured's damages. The insured has the burden of proving the extent of his loss. And if the insurance policy defines how loss will be measured, the insured is "relegated" to that measure. But a contractual limitation of liability—that is, a cap on what the insurer will have to pay out, independent of the value of the loss—falls upon the insurer to plead and prove.

*Ayoub v. Chubb Lloyds Ins. Co.*, 641 Fed. Appx. 303, 307 (5th Cir. 2016) (internal citations and quotations omitted). These burdens are consistent with controlling Texas authority along with Texas Insurance Code section 554.002 which places a burden of proof on the insurer as to any avoidance of

liability which must be affirmatively pled. TEX. INS. CODE § 554.002; *see also Gilbert Tex. Constr., LP v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 123 (Tex. 2010).

**(3) In conjunction with the applicable substantive burdens under Texas law, Plaintiffs need only provide some evidence from which the jury can allocate covered damages to defeat State Auto's motion on Plaintiffs' breach of contract claim.**

Consistent with the insured's initial burden to prove coverage (as briefed above), it is longstanding Texas law that an insured must provide some evidence from which the jury can "allocate" or "segregate" damages in order to determine that at least some damages were caused by a covered peril under the policy. *See Nat'l Union Fire Ins. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 735 F. Supp. 2d 650, 669 (S.D. Tex. 2010); *Travelers Indemnity Co. v. McKillip*, 469 S.W.2d 160, 162 (Tex.1971); *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 303 (Tex. App.—San Antonio, 1999, pet. denied)). If an insured presents some evidence of covered damages—even if disputed by the insurer—then the insured has met its burden, the evidence must be evaluated by the jury, and summary judgment in the insurer's favor is improper. *See, e.g., Presswood v. Allstate Vehicle & Prop. Ins. Co.*, 2017 U.S. Dist. LEXIS 145712, at *11–12 (E.D. Tex. Aug. 11, 2017); *Hahn,* 2017 U.S. Dist. LEXIS 53178, at *24–25 (W.D. Tex. Apr. 6, 2017). "**[C]ourts have recognized that the allocation is almost always a fact question; it is only where the insured cannot produce *any* evidence at all with regard to allocation that his claims are subject to judgment as a matter of law on that basis**." *Presswood,* 2017 U.S. Dist. LEXIS 145712, at *11 (emphasis added).

**C. There is extensive evidence from the Plaintiffs, their experts, and State Auto's own documents and testimony that, at minimum, creates a genuine fact issue regarding Plaintiffs' breach of contract claim.**

It is axiomatic under Texas law that a plaintiff claiming breach of an insurance contract must show that the contract covered the loss. *See, e.g., Metro Hosp. Partners, Ltd. v. Lexington*

*Ins. Co.*, No. H-15-1307, 2017 U.S. Dist. LEXIS 43766, at *13 (S.D. Tex. 2017). Consistent with this, in assessing the amount of evidence sufficient to satisfy the insured's initial burden, courts have made clear that an insured need not allocate covered damages from non-covered damages with any sort of "mathematical precision" and instead must simply present some credible evidence regarding the covered cause of loss for the jury to evaluate. *See Hahn.,* 2017 U.S. Dist. LEXIS 53178, at *24–25 (*citing Wallis,* 2 S.W.3d at 304); *see also Fiess v. State Farm Lloyds,* 392 F.3d 802, 808 (5th Cir. 2004) (the insured is not required to produce "overwhelming evidence that would allow a jury to flawlessly segregate" damages). Regarding the type of evidence required, the Texas Supreme Court instructs that an expert opinion is not necessary; lay testimony and/or circumstantial evidence will suffice. *Lyons v. Millers Cas. Ins. Co. of Texas,* 866 S.W.2d 597, 601 (Tex. 1993) (*citing United States Fidelity and Guar. Co. v. Morgan,* 399 S.W.2d 537, 540 (Tex. 1966)) (noting that "testimony of [the plaintiff] and her neighbors . . . constituted some evidence of the extent of damage attributable solely to the windstorm"); *see also Hahn.,* 2017 U.S. Dist. LEXIS 53178, at *24–25. Nevertheless, under Texas law, an expert opinion that damages were caused by a covered event is most definitely competent evidence sufficient to satisfy the insured's burden and consequently defeat an insurer's summary judgment motion based on allocation argument. *See, e.g., Presswood*, 2017 U.S. Dist. LEXIS 145712, at *11–12 (denying defendant-insurer's motion for summary judgment on breach of contract claim because plaintiff-insured's expert opinion that the reported amount of damages were caused by a covered wind and hail storm was some evidence of causation).

In this case, there is evidence from multiple sources that makes clear there is covered damage to all ten Properties or, at bare minimum, a fact issue regarding whether there was covered damage, and summary judgment is inappropriate.

**(1) State Auto's own adjusters found covered losses for the interior of all ten of the Properties as a result of Hurricane Harvey.**

State Auto's own adjusters found covered damage to the interiors of all ten properties. (*See* Dkt. 19 ¶ 4; Ex. 6, October 5, 2017 letter; Ex. 7, October 13, 2017 letter; Corbett Dep. at 65:8-23, 67:22-68:2, 77:15-78:17; Stivers Dep. at 76:11-15.) For only one of the properties, 3719 Fry Road, did State Auto find damages that exceeded the applicable $5,000 deductible. (Ex. 6, October 5 letter; Corbett Dep. 64:11-19; 65:19-23). State Auto nonetheless declined coverage for damage to the roof and exterior of all ten buildings, invoking policy exclusions and limitations including "faulty design, faulty workmanship," and "wear and tear," and finding "no storm created openings." (*See* Ex. 6, 7).

State Auto has therefore acknowledged that the "interior damage as a result of water that came in from the roof . . . **from the Hurricane Harvey event would be considered a covered cause of loss for that . . . occurrence.**" (Corbett Dep. at 67:13-21). This leaves no doubt that Hurricane Harvey caused covered damage to the Properties. When asked how it determined that all ten properties sustained covered damages to the interior, but not a single property sustained covered damages to the *exterior,* State Auto's corporate representative testified that, under the Policies, "if an excluded cause of loss results in a covered cause of loss, we will pay for loss or damage caused by that covered cause of loss." (*Id.* 66:11-21).

In spite of this clear, obvious, and admitted damage to the interiors due to Hurricane Harvey, State Auto nonetheless denied the claim for exterior damage to all ten properties. But the following facts from its own file and depositions cast significant doubt on its own coverage findings:[3]

---

[3] This same evidence also supports denial of State Auto's motion for summary judgment on Plaintiffs' extracontractual claims. *See infra,* § IV(E)(2).

- State Auto's denials of exterior coverage for all of the Properties was based almost entirely on the "visual inspections" of its field adjuster, Daniel Prough. (*See* Corbett Dep. 69:10-18 ("visual inspection" by Prough determined no wind damage); 71:14-72:2 ("visual inspection" by Prough led to denial based on "deterioration" and lack of wind damage); 72:22-73:8 ("[Prough] wouldn't know about the maintenance history," but his "visual inspection" supported denial based on improper maintenance); 75:8-18 ("visual inspection" supports wear and tear denial).

- State Auto never raised an issue contesting the date of loss in their denials (*Id.* 63:13-18), and even acknowledges that Harvey caused the covered damages to the interior. (*Id.* at 67:13-21). State Auto's corporate representative Julie Corbett testified "if you're looking to see when an event occurred, if you're trying to determine a date of loss or whether it fell within a policy period, you may need to know the wind speeds of when it could have potentially caused actual damage. . . . " (Corbett Dep. 63:3-12).

- State Auto did not study or consult meteorology reports or wind speeds in the area at the time of loss for Hurricane Harvey because its adjuster felt it was "irrelevant . . .because there was no wind damages present" (Corbett Dep. 62:6-9, 59:24-60:2; Prough Dep. 57:16-58:4).

- State Auto did no research of the age of any of the roofs for which it denied coverage based on the "deterioration" and "wear and tear" exclusions, even though its adjuster acknowledged this was an "important factor" when invoking such policy exclusions (Prough Dep. 54:19-55:16), and relied wholly on the "experience, training . . . and visual inspection" of its field adjuster to reach this conclusion (Corbett Dep. 71:14-72:2);

- It denied coverage based on "faulty workmanship," "prior repairs," and "faulty design" despite never having requested or reviewed maintenance history, repair logs, or other historical records (Ex. 7, Rothchild Moore letter; Corbett Dep. 72:22-73:8; Prough Dep. 52:7-53:8).

State Auto's position, in sum, is that (1) the water intrusion from Hurricane Harvey resulted in a covered loss for all ten properties, but (2) somehow, not one of the ten Properties that suffered covered *interior* damages due to Harvey, suffered covered *roof or exterior* damages. The jury, as factfinder, should evaluate the veracity and reliability of those suspect findings.

**(2) Plaintiffs' experts provide evidence of covered damages under the Policies, and ruled out other, non-covered damages to the Properties.**

As Plaintiffs already briefed in great detail in their response to State Auto's motion to strike (Dkt. 23), Plaintiffs' retained experts have presented ample evidence of covered damages to the

Properties.

### a. There is uncontradicted evidence of severe tornadic and mesocyclone activities in proximity to the Properties.

All of the reports of Plaintiffs' retained experts Tom Irmiter and Rebecca Calvert collected and incorporated NOAA and NEXRAD severe weather data, which measured the wind speed (including that caused by tornadoes and mesocyclones in the area), as well as the rainfall information, in the proximity of each of the ten properties. (*See, e.g.,* Dkt. 19-27, report of 8945 S. Fry Road, ¶¶ 1.1-1.5). This formed the bedrock for the experts' ultimate conclusions that Hurricane Harvey caused the property damage. State Auto does not attack the substance, accuracy, or reliability of this weather data; indeed it does not even mention weather, wind speeds, or meteorology anywhere in its motion. (*See* Dkt. 19). The weather data for each property is embodied in each FBS report, as follows, included in the summary judgment record:

| Property Address | Record cite |
|---|---|
| 14800 Westheimer Road | Dkt. 19-27 §§ 1.1-1.5 |
| 15015 Westheimer Road | Dkt. 19-28 §§ 1.1-1.6 |
| 15115 Westheimer | Dkt. 19-29 §§ 1.1-1.6 |
| 1997 Katy Mills | Dkt. 19-30 §§ 1.1-1.5 |
| 3719 Fry | Dkt. 19-31 §§ 1.1-1.5 |
| 5613 2nd St | Dkt. 19-32 §§ 1.1-1.5 |
| 5613 3rd St | Dkt. 19-33 §§ 1.1-1.5 |
| 8945 S. Fry | Dkt. 19-34 §§ 1.1-1.5 |
| 9006 S. Fry | Dkt. 19-35 §§ 1.1-1.5 |
| 920 S. Fry | Dkt. 19-36 §§ 1.1-1.6 |

**b. Irmiter and Calvert found "direct physical loss of or damage to" the roofs of all of the Properties.**

Also as briefed extensively in Plaintiffs' prior briefing (Dkt. 23), Plaintiffs' experts Irmiter and Calvert formed their ultimate opinions through a meticulous, data-driven process. For each of the ten Properties, they concluded that the roof was damaged by Hurricane Harvey, and required full replacement.

| Property Address | "Direct physical loss of or damage to covered property" identified (summary) |
|---|---|
| 14800 Westheimer Road | Irmiter Decl. ¶14;<br>Calvert Decl. ¶10;<br><br>Dkt. 19-27 §§ 3.1 ("based on the interior water trails on the metal decks, the damage of the roof assembly was consistent with the storm event"); 6.0 ("stone ballasted built-up roof assembly was damaged during Tropical Storm Harvey and must be completely replaced…water has damaged the fiberboard underlayment and paper facing on the fire rated insulation…the building is out of compliance with the fire code as a direct result of the water entering the roof system during Hurricane Harvey"); 7.0 ("wind and historic amounts of rain damaged the BUR roof assembly materials covering the building. Location of storm created openings is marked by ballast.") |
| 15015 Westheimer Road | Irmiter Decl. ¶15;<br>Calvert Decl. ¶11;<br><br>Dkt. 19-28 §§ 3.1 ("core helps shed light on the type of damage the roof assembly has experienced from the storm event and assists in recommending adequate repair strategies. Damage on the roof assembly was consistent with the storm event."); 5.0 ("stone ballasted built-up roof assembly was damaged during Tropical Storm Harvey and must be completely replaced…water has damaged the fiberboard underlayment and paper facing on the fire rated insulation…the building is out of compliance with the fire code as a direct result of the water entering the roof system during Hurricane Harvey"); 6.0 ("wind and historic amounts of rain damaged the BUR roof assembly materials covering the building. Location of storm created openings is marked by ballast.") |

15

| | |
|---|---|
| 15115 Westheimer | Irmiter Decl. ¶16<br>Calvert Decl. ¶ 12<br><br>Dkt. 19-29 §§ 3.2 ("core cuts were performed on the roof assembly. The core helps shed light on the type of damage the roof assembly has experienced from the storm event and assists in recommending adequate repair strategies. Damage on the roof assembly, including uplift and cap sheet separation with cracking of the membrane, was consistent with the storm event."); 3.3 ("Damage due to wind-blown debris was observed at multiple locations"… De-bonded roofing material was observed along some parapet walls…. Creases and wrinkling in the membrane was observed, including cracking, which is consistent with wind damage and water in the system."); 6.0 ("the modified-bitumen roof assembly was damaged during Tropical Storm Harvey and must be completely replaced….") 7.0 ("wind and historic amounts of rain damaged the modified-bitumen roof assembly materials covering the building.") |
| 1997 Katy Mills | Irmiter Decl. ¶17<br>Calvert Decl. ¶ 13<br><br>Dkt. 19-30 §§ 3.3 ("Damage to the roof assembly was consistent with the storm event"); 3.4 ("Damage to the roof related to wind and rain includes . . . the following: Crimping of the metal panels consistent with wind uplift and panel recovery, impact damage marks consistent with wind borne debris, panel shift at fasteners consistent with wind damage."); 6.0 (the roof assembly, including some locations on the interior, were damaged during Tropical Storm Harvey and must be repaired. Crimped panels and panel shift at fasteners will require replacement of damaged fasteners and panels. Collateral damage to insulation will require replacement of damaged insulation"); 7.1 (Isolated damage to this structure from the storm event includes the following, loss to the roof system service life and water resistive properties, water damage to underlying roof assembly materials (insulation and metal decking), and decreased insulation performance, water damage to interior finishes"). |
| 3719 Fry | Irmiter Decl. ¶18<br>Calvert Decl. ¶ 14<br><br>Dkt. 19-31 §§ 3.2 ("Damage to the roof assembly was consistent with the storm event"); 3.3 ("Crimping of the metal panels consistent with wind damage, impact damage marks, some of which may be from debris strikes, warped panels consistent with wind damage, loosened/bent standing seams in continuous lines, |

| | |
|---|---|
| | some recent patchwork was observed"); 7.1 ("damage to this structure from the storm event Includes the following: loss to the roof system service life and water resistive properties; water damage to underlying roof assembly materials (insulation and metal decking), and decreased insulation performance; water damage to interior finishes"). |
| 5613 2nd St | Irmiter Decl. ¶19; Calvert Decl. ¶15; <br><br> Dkt. 19-32 §§ 3.1 ("The core helps shed light on the type of damage the roof assembly has experienced from the storm event and assists in recommending adequate repair strategies. Damage on the roof assembly was consistent with the storm event"); 3.2 ("Damage to the roof related to wind and rain includes, but may not be limited to, the following: de-bonded roofing material was observed at parapet walls and at some locations on the roof consistent with wind damage and water under the cap sheet; damage due to wind-blown debris was observed at multiple locations; high readings were observed on the Tramex Moisture Meter at some locations; anomalies were observed with the infrared camera throughout the roof assembly"); 6.0 ("the modified-bitumen roof assembly was damaged at the high side of the roof parapet wall during Tropical Storm Harvey, which allowed water to enter the assembly and damage the roof assembly, including finished ceilings and below deck insulation, and must be completely replaced"); 7.1 ("Damage to this structure from the storm event includes the following: loss to the roof system service life and water resistive properties; water damage to underlying roof assembly materials and decreased below deck insulation performance; water damage to interior finishes"). |
| 5613 3rd St | Irmiter Decl. ¶20; Calvert Decl. ¶16; <br><br> Dkt. 19-33 §§ 3.1 ("The core cuts help shed light on the type of damage the roof assembly has experienced from the storm event and assists m recommending adequate repair strategies. Damage on the roof assembly was consistent with the storm event"); 3.2 ("Damage to the roof related to wind and rain includes, but may not be limited to, the following: two soft spots were noted when walking on the roof; multiple debris strikes were noted to the modified bitumen; debonded cap sheet was noted; high readings were observed on the Tramex Moisture Meter at some locations; anomalies were observed with the infrared camera throughout the roof assembly"); 6.0 ("the roof assembly was damaged during Tropical Storm Harvey and must be completely replaced. |

| | |
|---|---|
| | Failure to replace the roof assembly at the property will result in additional damage due to water intrusion"); 7.0 ("Windborne debris and historic amounts of rain damaged the modified-bitumen roof assembly materials covering the building. Water in the assembly was consistent with amount of rain and duration of storm. Debonded cap sheet was consistent with water in the system and the effects of wind during the event"); 7.1 ("Damage to this structure from the storm event includes the following: loss to the roof system service life and water resistive properties, water damage to underlying roof assembly materials and decreased insulation performance, water damage to interior finishes"). |
| 8945 S. Fry | Irmiter Decl. ¶21<br>Calvert Decl. ¶17;<br><br>19-34 §§ 3.1 ("One core cut was performed on the roof assembly. The core cut helps shed light to the type of damage the roof assembly has experienced from the storm event and to assist in recommending adequate repair strategies. Damage on the roof assembly was consistent with the storm event"); 3.2 ("Damage to the roof related to wind and rain includes, but may not be limited to, the following: debonding at the edges of modified bitumen sheets; cap sheet separation from substrate; raised cap sheet exhibiting cracks at numerous locations causing openings; multiple debris strikes were noted to the modified bitumen; high readings were observed on the Tramex Moisture Meter at some locations; recent patchwork was observed"); 6.0 ("we have concluded that the modified-bitumen roof assembly was damaged during Tropical Storm Harvey and based on the type of damage, including cap sheet separation, cap sheet cracking, and wet insulation, the entire roof assembly must be replaced"); 7.1 ("Damage to this structure from the storm event includes the following: loss to the roof system service life and water resistive properties from cracked and debonded cap sheet, water damage to underlying roof assembly materials (foam insulation and metal decking), and decreased insulation performance, and water damage to interior finishes"). |
| 9006 S. Fry | Irmiter Decl. ¶22<br>Calvert Decl. ¶18;<br><br>Dkt. 19-35 §§ 3.3 ("damage to the roof assembly was consistent with the storm event"); 3.4 ("Damage to the roof related to wind and rain includes, but may not be limited to, the following: crimping of the metal panels consistent with damage by wind; impact damage marks, consistent with those from debris strike; loosened panel ends at overlapping sections; bend fasteners |

| | |
|---|---|
| | consistent with panel shift caused by wind; recent temporary patchwork was observed"); 6.0 ("we have concluded that the roof assembly was damaged during Tropical Storm Harvey and must be completely replaced. Failure to replace the roof assembly at the property will result in additional damage due to water intrusion. In our opinion, changes in energy code requirements will result in additional costs to meet the current insulation requirements. Most recent commercial codes and/or manufacturer's installation instructions may also require additional work and/or modifications"); 7.1 ("damage to this structure from the storm event includes the following: loss to the roof system service life and water resistive properties; water damage to underlying roof assembly materials (insulation directly below roof metal), and decreased insulation performance; and water damage to interior finishes"). |
| 920 S. Fry | Irmiter Decl. ¶23; <br> Calvert Decl. ¶19; <br><br> Dkt. 19-36 §§ 3.1 ("Two core cuts were performed on the roof. The core cuts help shed light on the type of damage the roof assembly has experienced from the storm event and assists in recommending adequate repair strategies. Damage on the roof assembly was consistent with the storm event"); 3.2 (Damage to the roof assembly related to wind and rain includes, but may not be limited to, the following: de-bonded roofing material was observed at multiple locations. The apex of the lift showed signs of initial cracking consistent with wind uplift;  loss of surface granule and granule build up was observed at multiple locations; damage due to wind-blow debris was observed at multiple locations; high readings were observed on the Tramex Moisture Meter throughout the roof assembly; anomalies were observed with the Infrared camera throughout the roof assembly"); 6.0 ("the accumulated weather information, we have concluded that the modified-bitumen roof assembly including the above deck insulation was damaged during Tropical Storm Harvey and must be completely replaced. Separation of the roof assembly cap sheet from the substrate Is causing cracking and physical damage to the cap sheet. Failure to replace the roof assembly coverings at the property will result in additional damage due to water intrusion. In our opinion, based on the age of the building and changes to the building and energy codes between the date of original construction and the date of loss, additional costs to repair the assembly will be required to meet the current required code and/or manufacturer's installation instructions"); 7.2 ("Damage to this structure from the storm event includes the following: loss to the roof assembly service life and water |

| | resistive properties; water damage to underlying roof assembly materials and decreased insulation performance"). |

The foregoing evidence is more than sufficient to permit the jury to evaluate and decide whether there was covered damage to the Properties, rendering summary judgment improper. *Presswood,* 2017 U.S. Dist. LEXIS 145712, at *11.

### c. Irmiter and Calvert meticulously analyzed, and ultimately excluded, potential alternate causes of damage.

Lastly, Irmiter and Calvert segregated between covered and non-covered damage by considering, and excluding, potential alternate causes of damage. As a threshold matter, to the extent State Auto relies on the exclusions for "maintenance, wear and tear, and preexisting conditions" as a basis to deny Plaintiffs' claims (and obtain summary judgment), this is a backdoor attempt at impermissibly shifting the substantive burdens of proof in this case. As briefed above, Plaintiffs' initial burden is simply to show a covered loss along with the value of that loss. *See Ayoub,* 641 F. App'x at 307. Neither Plaintiffs, nor their experts, bear the burden to *disprove* the presence of "maintenance, wear and tear, and preexisting conditions" to the extent those purported conditions form the basis of State Auto's denial.

In any event, for each of the ten properties, Irmiter and Calvert examined areas where it appeared previous leaks were present, and documented them. (Irmiter Decl. ¶10, 14-24; Calvert Decl. ¶7 - 20). For each of the ten properties, FBS took infrared photographs of the roof assembly. (Irmiter Decl. ¶ 12; Calvert Decl. ¶ 8). This allowed them to compare the water intrusion from Harvey which they noted was "more significant" and "more widespread" than any of the observed prior isolated water leaks. (*See* Irmiter Decl. ¶12, 17-18, 21-22; Calvert Decl. ¶8, 13-14, 19-20). The infrared photographs reflected variances in temperature. (Ex. 9, deposition of Rebecca Calvert ("Calvert Dep.") 102:10-13). Calvert testified this could be due to various factors, including the

presence of moisture intrusion or difference in material. (*Id.* at 102:14 – 104:5.) But once the infrared photographs indicated a difference in temperature at a certain spot in the roof structure, Calvert and Irmiter then took core cuts of the affected roof surface to determine what caused this variance in temperature – whether it be water or some other cause. (*See* Calvert Dep. 104:6-105:5). These temperature differences are known as "anomalies." (Irmiter Dep. at 145:19-24.) Irmiter and Calvert then took core cuts of the roofing material at all of the properties except for three– 1997 Katy Mills Road, 3719 Fry Road, and 9006 S. Fry Road– because those properties have metal roofs for which a core cut is not possible. (*See* Irmiter Decl. ¶10, 14-24; Calvert Decl. ¶7, 10-20). For the three metal roof buildings where a core cut was not possible, they examined the interior of the buildings – including where ceiling tiles had been damaged – and compared this to the infrared photographs, historical satellite photos, and the reports from Competition Roofing. (*See* Irmiter Decl. ¶17-18, 22; Calvert Decl. ¶13-14, 18). They also observed whether and to what extent a portion of the roof material had been rusting at the point of water intrusion, which would suggest an older leak. (Calvert Dep. at 107:3-21). In addition to the core cut process that followed up their infrared testing, Calvert and Irmiter examined the interiors of the buildings to see if there was consistent discoloration on the ceiling tiles and walls, which indicated a singular event: Harvey. (*Id.* 108:13-109:2).

These processes led both Irmiter and Calvert to conclude:

For each Property I have considered the other potential causes raised by the insurance carrier, including maintenance or prior leaks, and have ruled them out as causes of the damage to the Properties. The cause of the loss and the damages contained within our opinions is Hurricane Harvey. Other potential causes have been evaluated and accounted for in our opinions, and our opinions reflect an allocation between covered damages (caused by Hurricane Harvey), and other, potential non-covered damages identified by the insurance carrier and their consultants. Hurricane Harvey, and the resultant damage to the roof structures and interior (as detailed in my reports and in this declaration) caused the need to make the repairs and replacements recommended in our report. Particularly, the damages have caused the roofs to no longer to be able to perform their intended function.

(Irmiter Decl. ¶ 24; Calvert Decl. ¶ 20).

### (3) Until Harvey, the Properties had never sustained damage sufficient for Plaintiffs to file a weather-related property damage claim with State Auto.

Lastly, the history of damage to the Properties provides circumstantial evidence that Harvey was the cause of the damage at issue here. Five of the Rothchild Family Properties sustained damage in 2008 as a result of Hurricane Ike: 15115 Westheimer, 920 S. Fry Road, 5613 2nd Street, 5613 3rd Street, and 3719 North Fry Road. (Rothchild Decl. ¶ 5.) As a result of those damages, Rothchild Family spent at least $250,000 on roof repairs for those five properties, including those repairs done by Competition Roofing. (*Id.*) In conjunction with the roof repairs done on those Properties, Competition Roofing gave a two-year warranty against leaks. (*Id.*) The repairs to those five Properties were all completed in 2011. (*Id.*)

After Harvey struck Houston, Plaintiffs' employees and owner Joseph Rothchild personally inspected and observed the damage to the Properties. (*See id.* ¶ 7.) Every one of the ten Properties suffered damage, including interior leaks. (*Id.*) On or about August 31, 2017, Plaintiffs filed an insurance claim with State Auto. (*Id.*)

Until filing those claims, Plaintiffs had previously only filed three property insurance claims with State Auto. (*See id.* ¶ 8.) The first claim was in September of 2013, when Plaintiffs made a claim after a car crashed into and damaged a sign at 15015 Westheimer. (*Id.*) The second claim, in February 2015, involved the failure of a hot water heater that caused an interior leak at 3719 N. Fry Road. (*Id.*) The second claim was in May of 2017, which involved an attempted break-in at 14800 Westheimer in which a vehicle crashed into an exterior wall. (*Id.*) None of those claims involved property damage (1) caused by wind or any other weather event, (2) to the roof or other part of the building that allowed exterior water intrusion. (*Id.*) In fact, until Hurricane Harvey, the

Properties did not sustain any weather-related damage during the period State Auto insured the Properties that was serious or significant enough to file a claim with State Auto. (*Id.* ¶ 9). This period includes the massive rainstorms and subsequent flooding in the Houston area in 2015 (the "Memorial Day" storm) or in 2016 (the "Tax Day" storm). (*Id.*)

The Properties have had some leaks throughout Plaintiffs' ownership of them, as most buildings in Houston with flat roofs do. (*Id.* ¶ 10). But in the time period between 2011 (after the roof repairs were done to 15115 Westheimer, 920 S. Fry Road, 5613 2nd Street, 5613 3rd Street, and 3719 North Fry), and Hurricane Harvey in August 2017, any repairs to the roofs of the Properties were either part of Plaintiffs' routine maintenance program, or in response to a leak that had been reported by a tenant or someone else at one of the Properties. (*Id.*) Plaintiffs would have any such leaks fixed promptly. (*Id.*) In the weeks and months prior to Hurricane Harvey, the roofs at all of the Properties were in good and satisfactory working order. (*Id.* ¶ 11). The leaks at the Properties after Harvey were not present before Harvey. (*Id.*) Hurricane Harvey – and not any prior storm or event – was what caused the damage to the Properties for which the Plaintiffs seek compensation in this lawsuit. (*See id.*)

*Hahn v. United Fire & Casualty Company* is instructive because the Western District of Texas evaluated and rejected an insurer's summary judgment motion premised on an argument similar to the one here. *See Hahn*, 2017 U.S. Dist. LEXIS 53178, at *24–26. *Hahn* involved a typical insurance coverage dispute where the insured was forced to file suit for the insurer's refusal to pay a property damage claim after a wind and hail storm. *Id.* at *24. The insurer filed a summary judgment motion, arguing the insured was unable to segregate damages. *Id.* at *21-22. In support of its argument, the insurer pointed to evidence demonstrating that property damages were caused, at least in part, by the excluded perils of improper maintenance or installation and claimed the

insured could not meet its burden to allocate between these excluded causes of loss and the covered

cause of loss, the wind and hail storm. *Id.*

In rejecting the insurer's argument and finding that the insured presented "some" evidence

that damages were in fact caused by the covered wind and hail event, the court looked at the

following two pieces of evidence: (1) testimony from the building's property manager that the

building had experienced leaks prior to the storm that had been sufficiently repaired but that after

the storm, the property began experiencing new leaks; and (2) evidence from the insurance carrier

that the building was in good, well-maintained condition. *Id.* at \*24. While the insurer certainly

disputed this evidence, the Court reminded the insurer that it is not entitled to simply disregard it:

"**While the Defendant would like to completely discount Plaintiff's evidence, circumstantial**

**evidence is still evidence**—the timing of the new leaks creates an inference that the storm may

have caused or contributed to those new leaks." *Id.*  In rejecting the insurer's allocation/segregation

argument, the court explained as follows:

> While Defendant has evidence to the contrary, **it would be difficult to conclude from the**
> **competing evidence that Plaintiff cannot allocate his loss between covered or non-**
> **covered causes at trial**—or, in other words, that there is no genuine dispute of material
> fact that Plaintiff cannot allocate his loss. Allocation of loss need not be made with
> mathematical precision—there simply must be some reasonable basis on which a jury can
> evaluate what percentage of loss was created by the covered cause of loss. *Wallis,* 2 S.W.3d
> at 304. Thus even assuming that all loss caused by faulty repairs is non-covered—and the
> Court turns to that assumption in a moment—**the Court is unconvinced, based on the**
> **competing evidence, that Plaintiff will not be able to allocate between covered and**
> **non-covered loss, and denies Defendant's motion for summary judgment on that**
> **basis**.

*Id.* at \*24–25 (emphasis added). Accordingly, because the plaintiff provided evidence the property

was damaged by a covered wind and hail storm, the plaintiff met its burden and summary judgment

in the insurer's favor was therefore improper. *Id.*

Likewise, here, Plaintiffs' evidence of the timing of the leaks is alone sufficient to defeat

State Auto's motion for summary judgment on allocation/segregation. But this evidence is especially persuasive when considered in context of (1) the significant covered damage found by State Auto to the interior of the Properties, thereby confirming the date and cause of loss as Hurricane Harvey; and (2) the evidence of Plaintiffs' experts supporting the cause of loss and ruling out alternate causes. (*See supra* § IV(C)(1-2). The Court can and should reject State Auto's allocation arguments.

### D. State Auto's "isolated damage" argument misconstrues the applicable Policy language.

State Auto next argues that Plaintiffs cannot seek full roof replacements for "isolated damage" because "Plaintiff has provided no evidence to identify the specific portions of the roofs that were physically damaged by Harvey." (Dkt. 19 ¶ 20). This argument misconstrues both the facts and the applicable Policy coverage.

The Policies provide, "we will pay for direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss." (Dkt. 19-1, Rothchild Family Policy, at 89; Dkt. 19-2, Rothchild Moore Policy, at 78). The Policies also contain "additional coverages" for "collapse," providing, "we will pay for direct physical loss or damage to Covered Property caused by a collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more of the following…weight of rain that collects on a roof." (19-1 at 91; 19-2 at 80.) Nothing in the applicable Policy language supports State Auto's argument, which suggests that Plaintiffs bear the burden to itemize every square inch of damage to every roof at every Property. Neither the law nor the Policy requires that. Moreover, neither Plaintiffs nor their experts bear the burden to account for "preexisting damage and other elements" to the extent this implicates the exclusions and limitations State Auto has invoked to deny Plaintiffs' claims. *See Standard Waste Sys. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398 (5th Cir. 2010); TEX. INS.

CODE § 554.002 (Under Texas law, policy exclusions and limitations are affirmative defenses for which State Auto has the burden to prove at trial).

As Plaintiffs briefed extensively *supra* § IV(C)(2)(b), there is significant evidence of covered damage based on "direct physical loss of or damage to" the Properties. The Court should reject State Auto's strained and unsupported argument.

### E. Plaintiffs' extracontractual claims should proceed to trial.

State Auto argues that Plaintiffs' extracontractual claims fail because (1) a "bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith" and (2) Plaintiffs' misrepresentation-based claims fail for lack of evidence. (Dkt. 19 ¶¶ 21-26.) Both arguments fail.

### (1) The applicable Texas law governing State Auto's conduct in handling, investigating, and paying Plaintiffs' insurance claim is well established.

Under Texas law, an insurer has a common law duty to deal in good faith and fairly with its insureds in handling their claims. *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 459 (5th Cir. 1997).  The Texas Supreme Court has fully fleshed out this duty and found that insurers may breach it in a number of ways. Most commonly, an insurer breaches this duty when it denies or delays payment of a claim without a reasonable basis for doing so. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 50–51 (Tex. 1994). In other words, if an insurer "fail[s] to effectuate a settlement after its liability has become reasonably clear," it is liable for having failed to act in good faith. *Id.* at 55.  In addition to delaying or denying a claim, an insurance company also breaches its duty by "failing to reasonably investigate a claim." *Id.* at 56 n. 5 (citing *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). The Texas Supreme Court has expounded upon this concept, explaining that "[a]n insurer will not escape liability merely by failing to investigate a claim so that it can contend that liability was never reasonably clear." *Giles*,

950 S.W.2d at 56 n. 5. The Texas Supreme Court has rejected attempts by insurers to shift responsibility of claim handling to their insureds, instructing "**it is the insurer that has the duty to reasonably investigate a claim, not the insured**." *See State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 47 (Tex. 1998) (emphasis added). The focus is on the reasonableness of the **insurer's** conduct in handling the claim and not on whether the claim was valid. *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex. 1993) (emphasis added).

In addition to the common law requirement of good faith and fair dealing imposed upon insurers operating in Texas, the Texas Insurance Code codifies several actions amounting to "unfair settlement practices" which, if violated, subject an insurer to penalties. Although separate causes of action, the same evidence which supports a claim for breach of the common law duty of good faith supports violations of the Texas Insurance Code as well. *Mason v. Tex. Farmers Ins. Co.*, No. 4:09-CV-03134, 2011 U.S. Dist. LEXIS 94157, at *11 (S.D. Tex. 2011) (denying summary judgment for insurer on unfair settlement practices under Texas Insurance Code because insured's claim "is supported by the same evidence the [insureds] relied on in support of their bad faith claim"); *see also Giles,* 950 S.W.2d at 55 (same standards apply to both claims).  As explained by the Texas Supreme Court and echoed by statute, "[t]he purpose of [the Texas Insurance Code] is 'to regulate trade practices in the business of insurance by defining, or providing for the determination of, *all* such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.'" *Liberty Mutual Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 485 (Tex. 1998) (emphasis in original) (citing TEX. INS. CODE § 541.001 (formerly art. 21.21, § 1(a)).

In line with its purpose to curb abusive and predatory insurance practices, the Texas

Insurance Code subjects an insurer to liability for unfair settlement practices if it (1) "fail[s] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear," (2) "fail[s] to promptly provide to a policyholder a reasonable explanation . . . for the insurer's denial of a claim or offer of a compromise settlement of a claim," or (3) "refus[es] to pay a claim without conducting a reasonable investigation with respect to the claim." TEX. INS. CODE § 541.060(a)(2)(A)-(3), (7). In addition to reasonably and competently handing individual claims, an insurance company must generally "adopt and implement reasonable standards for the prompt investigation of claims," or else be liable for unfair claim settlement practices. *Id.* § 542.003(b)(3). Lastly, an insurer commits an unfair and deceptive act if its agent makes any untrue statement of material fact, fails to state a material fact necessary to make other statements not misleading, or makes statements in a manner that would mislead a reasonable person to a false conclusion of a material fact. *Id.* §§ 541.061(1)-(3).

**(2) There is significant evidence of State Auto's violations of the Texas Insurance Code and the duty of good faith and fair dealing.**

As Plaintiffs briefed above in connection with their breach of contract claim, State Auto's own claim file and deposition testimony also supports Plaintiffs' extracontractual claims.

- **State Auto's denials of Plaintiffs' claims are based chiefly on the "visual inspections" and "eye test" of its adjuster, Daniel Prough.**

State Auto's denials of roof and exterior coverage for all of the Properties was based almost entirely on the "visual inspections" of its field adjuster, Daniel Prough. (*See* Corbett Dep. 69:10-18 ("visual inspection" by Prough determined no wind damage); 71:14-72:2 ("visual inspection" by Prough led to denial based on "deterioration" and lack of wind damage); 72:22-73:8 ("[Prough] wouldn't know about the maintenance history," but his "visual inspection" supported denial based

on improper maintenance); 75:8-18 ("visual inspection" supports wear and tear denial). The adjuster who sent the denials, Jennifer Stivers, never visited any of the ten Properties, and relied on Prough's "eye test" when she wrote the denial letters. (Stivers Dep. 27:7-9, 66:12-14). State Auto never hired an engineer, building consultant, or any other expert before denying Plaintiffs' claims. (Prough Dep. 72:23-73:6; Corbett Dep. 59:17-60:10).

- **State Auto failed to consult any weather data, building history information, or weight of water determinations before denying Plaintiffs' claims.**

Even though it found that there was no wind damage on all ten Properties, State Auto could not be bothered to consult any wind or other meteorological data to back up this conclusion. (*See* Ex. 6-7, letters; Corbett Dep. 62:6-9, 59:24-60:2; Stivers Dep. 64:1-12).  Field adjuster Daniel Prough – relying on his eye test – believed it was "irrelevant for me to look at" the wind speed "because there was no wind damages present." (Prough Dep. 57:16-58:4.) Prough testified he did no investigation as to the presence of tornadoes near the Properties, even though he acknowledged that hurricanes may spawn tornadoes. (*Id.* at 58:11-18). He testified that he did not investigation into the weight of the water on top of the Properties, even though he acknowledged that "can be" an important part of adjusting a hurricane claim. (*Id.* at 58:19-59:12).

- **State Auto did no research Auto into the maintenance or repair histories of the Properties before denying Plaintiffs' claims.**

State Auto did no research on the age of any of the roofs for which it denied coverage based on the "deterioration" and "wear and tear" exclusions, even though its adjuster acknowledged this was an "important factor" when invoking such policy exclusions (Prough Dep. 54:19-55:16), and relied wholly on the "experience, training . . .  and visual inspection" of its field adjuster to reach this conclusion (Corbett Dep. 71:14-72:2). It denied coverage based on "faulty workmanship," "prior repairs," and "faulty design" despite never having requested or reviewed maintenance

history, repair logs, or other historical records (Ex. 7, Rothchild Moore letter; Corbett Dep. 72:22-73:8; Prough Dep. 52:7-53:8).

- **The partial declination letter sent to Rothchild Family is misleading and omits key Policy language.**

This letter stated, "your policy does not provide coverage for the . . . wear and tear and maintenance issues." (Ex. 6, Rothchild Family letter, at 1). Both "wear and tear" and "maintenance" are exclusions under sections B.2. Yet, this letter fails to include pertinent Policy language that states, "[i]f an excluded cause of loss  . . . results in a 'specified cause of loss', we will pay for the loss or damage caused by that 'specified cause of loss.'" (Dkt. 19-1, Rothchild Family Policy at § B.2.k, p. 100).  Yet State Auto inexplicably failed to cite why the "windstorm" or "water damage" provisions – both a "specified cause of loss" as defined by the Policy, which State Auto knew its insured was claiming – did not apply as an exception to the exclusion. (*See id.* at § H(6), p. 110) (defining "Specified Cause of Loss" to include "windstorm" and "water damage"). This is the case even though State Auto's corporate representative later testified that *it was this same type of provision* that allowed State Auto to find coverage for the *interior* damages to the Properties. (*See* Corbett Dep. (66:11-21) ("if an excluded cause of loss results in a covered cause of loss, we will pay for loss or damage caused by that covered cause of loss.") This is a deceptive action because it did not provide Plaintiffs with complete information and reflects a lack of a complete or reasonable investigation of the loss prior to the denial; its corporate testimony months after the loss does not absolve this misdeed.

- **The Rothchild Moore denial letter fails to specifically state what exclusion is being applied to what damage.**

With the other denial letter sent October 13, 2017, State Auto listed several exclusions from the Rothchild Moore Policy as a basis for denying the claim on the three Rothchild Moore Properties. (*See* Ex. 7, Rothchild Moore letter). But State Auto fails to specifically tie any one of those exclusions to a specific Property; instead, it lumps all of the exclusions together. (*See id.*) This left Plaintiffs, its insureds, to guess why their claim was being denied on a specific Property. This is more evidence of State Auto's failure to reasonably investigate the claim.

- **One of State Auto's employees told Joseph Rothchild that his roof would be fully replaced at 8945 South Fry Road.**

The first adjuster State Auto assigned to Plaintiffs' claims was Jesus Gonzalez. (Stivers Dep. 43:2-7). In September or early October of 2017, Plaintiffs' principal owner Joseph Rothchild communicated with numerous representatives affiliated with State Auto, including individuals named Jesus Gonzalez, T.J. Magnell, and Dan Dixon. (Rothchild Decl. ¶ 12). Based on those discussions, Rothchild understood that they worked for State Auto and were assigned to Plaintiffs' claims in some capacity. (*Id.*) One of them assured Rothchild that he was going to get a new roof through State Auto at the Property located at 8945 S. Fry Road. (*Id.*) Rothchild understood this to mean that the damage to the roof at this Property was covered under the Policy, and that State Auto would pay for the replacement of that roof. (*Id.*) Rothchild later learned that Mr. Gonzalez was removed from his role as the adjuster of Plaintiffs' claim, and believes he was fired by State Auto. (*Id.*)

Lastly, Plaintiffs' expert on claims handling practices, Stephen Strzelec, will testify that "State Auto and its claim handlers failed to meet minimum industry standards" in handling Plaintiffs' claims because, in part, the claims were "denied prior to the completion of a reasonable investigation" and were "based on assumptions, speculation and conjecture." (Ex. 11, Declaration of Stephen Strzelec, ¶ 22.) As detailed in Plaintiffs' response to the motion to exclude or limit Strzelec's opinions (Dkt. 24), Strzelec's opinions are based on his significant experience and training in the insurance industry,

his knowledge of statutory and regulatory standards applicable to property and casualty claim handling, his review and knowledge of the claim files and other pertinent documents in this case, and his review and knowledge of texts, literature, and articles discussing claim handling. (*Id.* ¶ 23).

**F.  Plaintiffs' claims under Section 542 of the Texas Insurance Code should proceed to trial.**

Chapter 542 of the Texas Insurance Code requires insurers to follow strict procedures and meet certain regimented deadlines once an insured makes a claim. The purpose of the statute is to require insurers to promptly pay claims and courts are required to construe its provisions liberally to promote this purpose. *Id.* §§ 542.054.  An insurer violates the Texas Prompt Payment Statute ("TPPS") if, after receiving proper notice of the insured's claim, the insurer (1) fails to timely acknowledge, investigate, or request information on the claim; (2) fails to timely accept or reject the claim; (3) delays in paying the claim; or (4) wrongfully rejects a valid claim. *Id.* §§ 542.055; 542.056; 542.057; 542.058. With respect to the statutory time constraints, an insurer must notify its insured whether it accepts or rejects the claim within fifteen days of receiving all requested documentation. *Id.* § 542.056(a). Additionally, the statute is clear that an insurer has a maximum of sixty days to pay a claim. *Id.* § 542.058(a).

As briefed extensively above, State Auto wrongfully rejected Plaintiffs' claims and refused to pay for covered damages under the insurance Policies, which constitutes a breach of the insurance contract. (*See supra,* § IV(C).) If the jury returns a finding of liability in favor of the Plaintiffs on this point, then State Auto will be "liable for a claim" pursuant to Section 542.060 of the TPPS, subjecting State Auto to statutory interest and reasonable and necessary attorneys' fees. *See Barbara Techs. Corp. v. State Farm Lloyds*, No. 17-0640, 2019 Tex. LEXIS 687, at *28 (June 28, 2019) ("judgment that the insurer wrongfully rejected the claim" would be violation of Sec. 542.060); Tᴇx. Iɴs. Cᴏᴅᴇ. § 542.060. Under Section 542.058, State Auto "shall pay damages and

other items as provided by Section 542.060" if, "after receiving all items, statements, and forms reasonably requested and required . . .it delays payment . . . for more than 60 days." Tex. Ins. Code. § 542.058. Because Plaintiffs' breach of contract claim survive and should go to the jury, so too should their claims under Section 542.

### G. State Auto should not be rewarded by its own breach of the Agreement to enforce an actual cash value limitation.

State Auto next argues that Plaintiffs are limited to the actual cash value of the damage to the Properties – even though the Policy provides for replacement cost value – because "Plaintiffs have not undertaken the roof replacements for which they seek recovery." (Dkt. 19 ¶ 31). Although it is true that Plaintiffs have not made the repairs for which they seek recover, this is precisely why Plaintiffs were forced to file this lawsuit: State Auto has refused to pay what it owes under the Policy. If State Auto's argument wins the day, this would permit State Auto to reap the benefits of its violations of the Texas Insurance Code violations and force the Plaintiffs to self-fund repair efforts for which they purchased insurance in the first place. This is not what the Policy intended, nor what law or principles of equity provide.

### a. The jury should be able to calculate Plaintiffs' actual damages sustained by State Auto's failure to provide benefits under the Policy.

State Auto is liable for breach of contract if a valid contract exists and its refusal to perform under the contract damaged Plaintiffs. *See Frost National Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The rule for measuring breach-of-contract damages is to award the non-breaching party "all actual damages necessary **to put it in the same economic position in which it would have been had the contract not been breached**." *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.) (emphasis added). In the context of insurance, failure to pay a covered claim is a per se breach of contract

which entitles the insured to the amount of actual damages caused by the breach. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994).

Regarding property insurance, it is fundamental that policies may be purchased on a replacement cost value or actual cash value basis. Replacement cost value (RCV) means the amount necessary to repair or replace the property, which includes "any cost that an insured is likely to incur in repairing or replacing a covered loss." *Ghorman v. N.H. Ins. Co.*, 159 F. Supp.2d 928, 934 (N.D. Tex. 2001). Actual cash value (ACV) is the cost to repair or replace the property less any applicable depreciation. *See id.* Withholding *any* component of the cost to repair or replace the property, regardless of whether the cost is incurred, constitutes breach of contract as a matter of law. *Id.* at 935 (granting summary judgment because carrier withheld contractor's overhead and profit and sales tax, even though costs had not been incurred); *see also Guideone Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 828 (Tex. App.—Fort Worth 2008, no pet.).

Here, there is no dispute that Plaintiffs purchased RCV benefits under the Policy issued by State Auto, and that State Auto accepted a substantial premium for providing those benefits. (*See* Dkt. 19-1 at 32-38 (declarations pages specifying "Replacement Cost" for Rothchild Family Policies); Dkt. 19-2 at 32-34 (same, Rothchild Moore Properties). There is also no dispute that State Auto denied Plaintiffs' claim and has refused to pay for any wind damage to the Properties. (*See* Ex. 6-7, letters.)

More importantly, though, regardless of whether the Policy provides for ACV or RCV coverage, State Auto breached the contract by failing to fulfill *any* of its obligations. *See Moriel*, 879 S.W.2d at 17; *First Baptist Church of Bedford*, 268 S.W.3d 828. When a carrier breaches the insurance contract by denying or underpaying a claim, the actual damages sustained by the carrier's breach are calculated by a jury. *See Nat'l Lloyds Ins. Co. v. Lewis*, No. 09-13-00413-CV,

34

2015 Tex. App. LEXIS 1635, at *44-45 (Tex. App.—Beaumont Feb. 19, 2015). Because the Policies here provided for replacement cost benefits, the jury must include *all* amounts that were owed under the Policy, inclusive of depreciation, which should have been paid during the claims process—this is true regardless of whether repairs were ever made.

### b.  State Auto's prior material breach of the Policy prevents it from enforcing the ACV limitation.

State Auto's argument for application of the ACV limitation assumes that its other arguments lose, and that there is coverage under the Policy. (Dkt. 19 ¶ 31). This illustrates the weakness of its argument. As noted in the previous section, if Plaintiffs can show coverage, this will result in, at minimum, a breach of the Policy by State Auto. One case from the Supreme Court of Nebraska illustrates why State Auto should not be able to invoke the ACV limitation:

> If the insured has contracted for replacement cost coverage, the insured will normally be entitled under the policy to an immediate payment representing the actual cash value of the loss, which can be used as seed money to start the repairs.  Depending on the policy, the acceptance of this actual-cash-value payment may trigger a more limited time constraint for completion of the repairs, as it does here.  If the insured repairs or replaces the property within the time period stated in the policy, the insured will then be entitled to an additional payment for the amount by which the cost of the repair or replacement exceeded the actual cash value payment.  When the insurer has not breached its obligations under the policy, provisions which mandate actual repair or replacement as a condition to recovery of replacement cost damages are almost universally found enforceable.  In other words, the repair/replace condition is neither ambiguous nor unconscionable.  If the insurer accepts liability for the loss under the standard indemnity portion of the policy, the insured is bound to comply with the repair/replace condition before the insured can recover replacement costs.

*D & S Realty, Inc. v. Markel Ins. Co.*, 284 Neb. 1, 816 N.W.2d 1, 15-16 (Neb. 2012) (internal citations omitted). As the *D&S* court makes clear, a carrier's ability to enforce an ACV limitation presupposes that the carrier has properly made the ACV payment allowing the insured to make the repairs. *See id.* That, of course, did not happen in this case. Under the terms of the Policy, State Auto was obligated to pay for damages on an RCV basis. State Auto cannot refuse to pay for repairs

during the claims process and then request a reduction of legal damages on the basis that those repairs were not made.

State Auto's denial of the roof and exterior damages was a material breach of the Policy that waived its right to rely on any payment restrictions in the same Policy. It is fundamental that when one party commits a material breach of a contract, the remaining obligations and conditions under the contract cannot be enforced. *Mustang Pipeline Ins. Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). While the question of whether a breach is material is typically resolved by the factfinder in light of several non-exclusive factors, some breaches are material as a matter of law. *See id.* at 199. Material breaches are those that defeat the purpose of the contract and deprive the plaintiff of the benefit that would have been realized by full performance. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994).

State Auto's failure to provide *any* benefits for the roof and exterior damages and its complete denial of Plaintiffs' claims for those damages was a material breach of the Policy that defeated the entire purpose of the contract. *See Mustang Pipeline*, 134 S.W.3d at 196; *see also 15625 Ft. Bend, Ltd. v. Sentry Select Ins. Co.*, 991 F. Supp.2d 932, 937 (S.D. Tex. 2014) (explaining a "policy of property insurance is a personal contract for indemnity . . ."). State Auto cannot utilize certain contractual terms for its benefit while ignoring others.

### H. Plaintiffs provided proper notice for an attorneys' fees recovery under Section 542A.003 of the Texas Insurance Code.

State Auto's final, hyper-technical argument is that Plaintiffs are not entitled to attorneys' fees because they failed to comply with the notice requirements of Section 542A.003 of the Texas Insurance Code. (Dkt. 19 ¶¶ 32-33). It first argues that Plaintiffs' counsel sent the pre-suit notice letters to the wrong defendant. (*Id.* ¶ 33)("Plaintiffs' pursuit demand letters were addressed to 'State Auto Insurance Companies,' not to defendant State Automobile Mutual Insurance Company"). It

36

then argues that "Plaintiffs' counsel plainly failed to include the required statement in the letters that a copy of the notice was provided to the claimant; there is merely a notation to staff to carbon copy 'client.'" (*Id.*).

Both arguments fail. First, the argument that the notice letters went to the wrong defendant rings hollow because State Auto responded to both letters on June 8, 2018. (*See* Ex. 12, letter to Rothchild Family; Ex. 13, letter to Rothchild Moore.) Both letters acknowledge receipt of the demand, acknowledge the Policy numbers and addresses of the Properties, and request further inspections of the Properties. (*See id.*) Neither of the responses addressed or raised the issue of a misnomer. State Auto even acknowledges in its motion that it responded to the Plaintiffs. (Dkt. 19 ¶ 5). Furthermore, Plaintiffs' principal owner, Joseph Rothchild, received copies of the pre-suit demands before they went out to State Auto. (Rothchild Decl. ¶ 13). Plaintiffs therefore complied with Section 542A's demand requirements, and this argument should be rejected.

## V.   OBJECTIONS TO STATE AUTO'S SUMMARY JUDGMENT EVIDENCE

Under Federal Rule of Civil Procedure 56(c)(2), a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2); *Musket Corp. v. Suncor Energy U.S.A. Mktg.*, No. H-15-100, 2016 U.S. Dist. LEXIS 157664, at *3-4 (S.D. Tex. 2016). The comments to the Rule indicate that "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.;* Advisory Comm. Notes, 2010 Amendment.

### (1)  State Auto's Exhibits G-1 through G-7, roof estimates and correspondence from 2010, are inadmissible hearsay.

State Auto cites various demand letters and estimates from 2010 to support the proposition that "at the time of the Claims, the properties had preexisting damage from Hurricane Ike." (Dkt. 19 ¶ 6; Ex. G-1, G-2, G-3, G-4, G-5, G-6, G-7.) These letters and estimates, if offered to show the

truth of the matter asserted – i.e., that the Properties had preexisting damage from Ike – are textbook examples of inadmissible hearsay to which no exception applies. *See, e.g., United States v. Polidore*, 690 F.3d 705, 719 (5th Cir. 2012); Fed. R. Evid. 801 ("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.") The Court should sustain Plaintiffs objections and disregard this evidence.

### (2) The email from Plaintiffs' former public adjuster, Dkt. 19-13, is unauthenticated, inadmissible hearsay evidence that also lacks foundation pursuant to Rule 602.

State Auto attaches as Exhibit C-10 (Dkt. 19-13) an email purportedly from Plaintiffs' public adjuster, and argue that "Plaintiffs' public adjuster stated that 'no visible wind or storm-related damage to the properties' had been found." (Dkt. 19 ¶ 23). The evidence offered in support is an email from the email address "claims@claimnationusa.com" dated December 18, 2017. (Dkt. 19-13). First, the email is unauthenticated, and does not even list the name of a person from Claim Nation who is purportedly making this statement, and is not self-authenticating pursuant to Rule 902. Second, the purported statement lacks personal knowledge pursuant to FED. R. EVID. 602. There is no foundation establishing personal knowledge of this purported causation opinion, let alone the foundation for technical or scientific expert testimony. Third, the email is inadmissible hearsay to which no exception applies. *See Polidore*, 690 F.3d at 719; FED. R. EVID. 801. The Court should sustain Plaintiffs objections and disregard this evidence.

### VI.   CONCLUSION/PRAYER

The Court should deny State Auto's motion for summary judgment, and sustain Plaintiffs' objections to its summary judgment evidence.

Respectfully submitted,

*/s/ Jeffrey L. Raizner*
Jeffrey L. Raizner
Texas Bar No. 00784806
Southern District Bar No. 15277
Andrew P. Slania
Texas Bar No. 24056338
Southern District Bar No. 1057153
Amy B. Hargis
Texas Bar No. 24078630
Southern District Bar No. 1671572
Ben Wickert
Texas Bar No. 24066290
Southern District Bar No. 973044
Raizner Slania, LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel. (713) 554-9099
Fax (713) 554-9098
efile@raiznerlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to counsel of record on this the 16th day of September 2019, via ECF.

Patrick M. Kemp - *Attorney-In-Charge*
SEGAL MCCAMBRIDGE SINGER & MAHONEY
100 Congress Avenue, Suite 800
Austin, Texas 78701
Telephone: (512) 476-7834

*Of Counsel*:

R. Mark Willingham
SEGAL MCCAMBRIDGE SINGER & MAHONEY
5626 Cypress Creek Parkway
Houston, Texas 77069
(713) 333-7600

Robert G. Wall
SEGAL MCCAMBRIDGE SINGER & MAHONEY

100 Congress Avenue, Suite 800
Austin, Texas 78701
Telephone: (512) 476-7834
**ATTORNEYS FOR DEFENDANT**

/s/Jeffrey L. Raizner
Jeffrey L. Raizner